IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Crystal Clark, as Personal Representative of the Estate of Robert Mark Chaput, Jr., <br><br> Plaintiff, <br><br> v. <br><br> The United States of America, <br><br> Defendant. | **COMPLAINT** |

Plaintiff Crystal Clark, as Personal Representative of the Estate of Robert Mark Chaput, Jr., by and through her undersigned counsel, complaining of Defendant The United States of America, alleges as follows:

**JURISDICTIONAL ALLEGATIONS**

1. Plaintiff Crystal Clark (hereinafter, "Plaintiff" or "Ms. Clark") is the duly appointed Personal Representative of the Estate of her late father, Robert Mark Chaput, Jr. (hereinafter, "Decedent" or "Mr. Chaput"), having been appointed by the Horry County Probate Court.

2. Plaintiff brings this action against The United States of America (hereinafter, "Defendant" or "United States") for injuries and damages Plaintiff and Decedent sustained as a result of the negligence, recklessness, and/or gross negligence of the United States and its employees, servants, and/or agents.

3. At all times relevant to this Complaint, Plaintiff and Decedent were citizens and residents of Horry County, South Carolina.

4. Plaintiff brings this Complaint against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* and 28 U.S.C. § 1346(b)(1) for money damages as

compensation for the injuries and death of Robert Mark Chaput, Jr., which were caused by the acts and/or omissions of employees, servants, and/or agents of the United States Government, working at different Veterans Administration medical facilities, including the Myrtle Beach VA Clinic in Horry County, South Carolina and the Ralph H. Johnson VA Medical Center in Charleston, South Carolina.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because Plaintiff resides in this judicial district. Additionally, a substantial part of the acts and/or omissions forming the basis of these claims occurred in the District of South Carolina, Florence Division.

6. Plaintiff has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act by giving formal notice in writing to the United States through the filing of a Form 95 with the Department of Veterans Affairs. Six months have elapsed since the Form 95 was filed, and Ms. Clark has received neither an official denial nor a resolution of the claims asserted.

**FACTUAL ALLEGATIONS**

6. Plaintiff brings these claims due to the substandard medical, nursing, ministerial, supervisory, general, and non-medical care, as well as other actions or inactions of agents, servants, and/or employees of different veterans administration medical facilities in South Carolina, including but not limited to the Myrtle Beach VA Clinic in Myrtle Beach, South Carolina and the Ralph H. Johnson VA Medical Center in Charleston, South Carolina. These facilities are hereinafter collectively referred to as the "VA."

7. Mr. Chaput was a long-term patient of the VA and suffered from multiple medical conditions, including peripheral artery disease, chronic obstructive pulmonary disease (COPD), post-traumatic stress disorder (PTSD), hepatitis C, and a history of Agent Orange exposure.

8. Beginning in 2017, he underwent a series of increasingly invasive vascular interventions, including iliac stent placements, thrombectomy, femoral endarterectomy with patch angioplasty, superficial femoral artery atherectomy, and multiple bypass grafts, to address severe bilateral lower extremity claudication that limited his mobility and independence.

9. On April 8, 2019, Mr. Chaput underwent a Computed Tomography Angiography (CTA) runoff study to visualize the blood vessels in his abdomen, pelvis, and legs.

10. In addition to vascular findings, the April 8, 2019 CTA incidentally revealed an "ill-defined 8 mm area of arterial enhancement" in Mr. Chaput's liver.

11. The VA radiologist, Dr. Darryl Pauls, recommended multiphase MRI or CT imaging "to ensure there is no underlying lesion."

12. On April 8, 2019, Dr. Pauls authored a note stating, "Please see CTA report today for vascular and liver findings from CTA today," which was specifically directed to vascular surgeon Dr. Thomas Brothers.

13. This communication was subsequently co-signed by Dr. Brothers on the same day, thereby evidencing his receipt and acknowledgment of the concerning findings on the CTA.

14. On April 8, 2019, Dr. Avianne Bunnell conducted a Vascular Surgery History and Physical of Mr. Chaput and expressly documented that "an incidental lesion [was] found on his liver on his CTA."

15. This abnormal finding, noted contemporaneously with the CTA imaging, was recorded in the official VA medical record.

16. Despite this significant liver finding, Mr. Chaput was scheduled for a vascular procedure on April 23, 2019.

17.    As part of the pre-operative planning, the treatment team noted an intention to order a CT scan of the abdomen to evaluate the liver lesion further and to notify Mr. Chaput's primary care physician for appropriate follow-up.

18.    This note regarding the liver lesion and recommended follow-up was acknowledged by Mr. Chaput's primary care physician at the VA, Dr. Abdias J. De La Rosa Serrano, on April 13, 2019, thus confirming his knowledge of the liver lesion and the plan for additional diagnostic evaluation.

19.    On May 22, 2019, an administrative reminder was sent by VA staff member Nolisa Welch to Dr. De La Rosa Serrano, urging him to place the appropriate order for the follow-up abdominal CT scan.

20.    Dr. De La Rosa Serrano acknowledged this reminder on May 23, 2019.

21.    Nevertheless, the order Dr. De La Rosa Serrano placed was for an incorrect study.

22.    It was not until May 30, 2019 that Dr. De La Rosa Serrano acknowledged the error and noted that the imaging required was a CT scan with and without contrast.

23.    At a subsequent appointment on September 12, 2019 with mental health provider Dr. Douglas Southworth, the ordered CT scan still had not been performed.

24.    Dr. Southworth noted alarming clinical changes, including a four-pound weight loss since May 2019 and a significant drop in hemoglobin levels, from 15.5 to 12.0, along with the unresolved findings from the April CTA.

25.    Dr. Southworth formally copied both Dr. De La Rosa Serrano and Dr. Brothers on the note, both of whom subsequently signed the note acknowledging receipt.

26. During a primary care follow-up appointment on October 1, 2019, Dr. De La Rosa Serrano again documented that Mr. Chaput required a CT scan for follow-up evaluation of the previously identified liver lesion, yet the scan had still not been completed at that time.

27. The failure of Mr. Chaput's VA medical providers to order and ensure that Mr. Chaput underwent a follow-up CT abdomen scan until November 2019, seven months after the initial concerning liver findings on the April 8, 2019 CTA, despite multiple internal notations, specialist concerns, and primary care acknowledgments, demonstrates a troubling and unjustifiable delay in timely diagnostic testing, raising serious concerns about continuity and quality of care within the VA healthcare system.

28. On November 18, 2019, Mr. Chaput underwent the long-delayed follow-up CT scan of the abdomen and pelvis, which had originally been recommended in April 2019 to evaluate the liver lesion.

29. The reason for the November 18, 2019 scan was documented as "liver lesion and microscopic hematuria."

30. The study was interpreted by VA radiologist Dr. Marilyn Hendrix.

31. Despite the documented clinical concern for a liver lesion as the primary indication for the November 18, 2019 CT scan, Dr. Hendrix described the liver as "unremarkable" in the body of the report.

32. However, the report failed to mention of the prior abnormal finding, and the impression section of the report omitted any reference to the liver entirely.

33. No further diagnostic evaluation or follow-up action was initiated in response to the November 18, 2019 imaging.

34. This omission, in the context of previously documented abnormal liver findings and months of deferred imaging, constituted a missed opportunity for timely diagnosis and appropriate clinical follow-up.

35. Mr. Chaput continued to struggle with persistent right lower extremity claudication, requiring multiple angiograms, bypass surgery, and wound care following post-surgical complications including wound dehiscence and purulent drainage.

36. On December 16, 2019, Mr. Chaput was emergently readmitted to the Ralph H. Johnson VA Medical Center due to an infected right groin wound following vascular surgery.

37. He underwent an incision and drainage procedure with debridement, placement of a wound vac, and was treated with intravenous antibiotics.

38. The operative and post-operative records confirm that the wound was classified as "dirty/infected" and required inpatient care and follow-up with home health services.

39. On December 16, 2019, a CTA runoff examination was performed to assess the right femoral artery in the context of suspected infection.

40. The radiology report, authored by Dr. Kevin Quinn, described perivascular fluid collections adjacent to the right external iliac and common femoral arteries, findings suggestive of potential infection.

41. However, despite the availability of a prior CTA runoff study performed in April 2019, no comparison to this earlier imaging was made, which would have been the standard of care.

42. Instead, Dr. Quinn noted comparison only to the CT scan from November 18, 2019.

43. This failure to compare the December 2019 CTA runoff study to the April 2019 study constituted another missed opportunity to evaluate whether the previously noted liver lesion

had resolved, progressed, or remained stable, as well as to assess vascular changes relevant to Mr. Chaput's clinical condition.

44. The omission of a comparison to the April 2019 study, which originally identified the liver lesion, further delayed proper follow-up and care.

45. Notably, the radiology report from the December 16, 2019 CTA runoff did not reference or mention the previously identified liver lesion in any portion of the findings or impressions, despite the lesion being a documented abnormality of concern earlier in the year.

46. This continued omission by interpreting physicians reflects a pattern of failures by VA medical personnel to appropriately track and follow up on significant diagnostic findings.

47. By way of summary, at no point between the initial identification of a liver lesion on Mr. Chaput's April 8, 2019 CTA runoff study and his December 2019 hospitalization for an infected groin wound did the VA medical providers undertake an adequate workup of the liver lesion or provide Mr. Chaput appropriate consultation and notice of the potentially serious condition. Although the incidental liver lesion was noted in April 2019 and acknowledged by Mr. Chaput's primary care physician, Dr. De La Rosa Serrano, no timely diagnostic imaging or specialist referral was completed. A follow-up CT of the abdomen, finally performed more than seven months later on November 18, 2019, described the liver as "unremarkable," yet failed to reference the previously identified lesion and omitted any discussion of the liver under the impression section, despite the liver lesion being a primary indication for the study. When Mr. Chaput was again imaged during his December 16, 2019 hospitalization, the CTA runoff report authored by Dr. Quinn did not mention the liver lesion and failed to compare the scan to the April 2019 CTA, instead referencing only the November 2019 CT scan. As a result, the abnormal liver finding was neither appropriately evaluated nor monitored. It was not until a hospitalization in

February 2024 at Grand Strand Regional Medical Center that Mr. Chaput underwent appropriate imaging and biopsy, leading to a formal diagnosis of metastatic liver cancer.

48. In 2023, Mr. Chaput began to experience worsening pain in his right leg, and it was suspected that his prior right iliac stent had occluded.

49. On April 26, 2023, Mr. Chaput was seen by VA vascular surgeon Dr. Brothers and resident Dr. Agenor Paulino Dias in the vascular clinic due to right foot pain and two wounds on the right foot.

50. As a result of these findings, another CTA runoff study was ordered to assess the blood vessels in Mr. Chaput's lower extremities.

51. On May 3, 2023, Mr. Chaput was seen by his VA primary care physician, Dr. De La Rosa Serrano.

52. The note from this visit indicates that Dr. De La Rosa Serrano was informed by Mr. Chaput and his daughter, who accompanied her father to the visit, of the recent appointment at the VA vascular clinic and the scheduled CTA.

53. The CTA runoff study was performed on May 10, 2023.

54. The May 10, 2023 CTA revealed a suspicious extravascular finding regarding Mr. Chaput's liver.

55. The radiologist, Dr. Gregory Lewis Denison, noted an "[e]stimated 3 cm hypoattenuating/hypo enhancing zone in the inferior right lobe of the liver. Could just represent a hemangioma or focal steatosis, but probably warranting further evaluation with dedicated hepatic CT or MR on a routine basis."

56. Critically, Dr. Denison flagged the radiology report as containing a "SIGNIFICANT ABNORMALITY, ATTN NEEDED."

57. Despite this "significant abnormality" warranting further attention, there is no indication this finding was communicated to Mr. Chaput or further evaluated in 2023.

58. Additionally, no CT or other diagnostic scans were ordered or performed as recommended by Dr. Denison.

59. On May 17, 2023, Mr. Chaput was evaluated in the vascular surgery clinic at the Ralph H. Johnson VA Medical Center by Dr. Brothers and resident Dr. Brian Jacobs.

60. This visit was scheduled to address the findings of a CTA performed on May 10, 2023, which had revealed recurrent occlusion of Mr. Chaput's right common iliac artery and associated vascular disease.

61. During this visit, Dr. Jacobs conducted a comprehensive vascular surgery history and physical examination, which was co-signed by Dr. Brothers.

62. The results of the May 10, 2023 CTA were reviewed, and a treatment plan was developed for a left-to-right femoral-femoral (fem-fem) bypass and left iliac artery stent placement to address Mr. Chaput's worsening symptoms of right lower extremity ischemia.

63. The planned procedure was scheduled for June 1, 2023, and informed consent was obtained from Mr. Chaput during the clinic visit.

64. However, despite the fact that the May 10, 2023 CTA explicitly documented a suspicious 3 cm hypoattenuating/hypoenhancing lesion in the inferior right lobe of the liver, and further recommended follow-up imaging to evaluate for malignancy or other pathology, neither Dr. Brothers nor Dr. Jacobs discussed this abnormal liver finding with Mr. Chaput, nor did they document any referral or follow-up plan to address the potentially serious liver abnormality.

65. This omission occurred in the context of Mr. Chaput's years-long history of an unresolved liver lesion previously identified on VA imaging dating back to 2019.

66.     The vascular findings from the May 10, 2023 CTA, including recurrent right iliac occlusive disease with widely patent distal runoff, were specifically addressed and documented in the clinical notes authored by Dr. Jacobs and co-signed by Dr. Brothers.

67.     However, the absence of any mention of the liver lesion, despite its prominence in the radiology report, represents yet another failure by VA clinicians to pursue or even acknowledge this concerning and longstanding abnormality.

68.     On June 1, 2023, Dr. Brothers performed the left-to-right fem-fem bypass surgery on Mr. Chaput.

69.     His post-operative course was complicated by pain, continued weight loss, falls, bilateral groin pain, and symptoms of urinary obstruction.

70.     Despite these progressively worsening symptoms and red flags, no comprehensive evaluation was triggered.

71.     On October 30, 2023, Mr. Chaput was evaluated in a face-to-face primary care visit with his VA primary care physician, Dr. De La Rosa Serrano.

72.     Dr. De La Rosa Serrano documented in his note that he spent 16 minutes on the visit with Mr. Chaput, and that "test results, including lab studies, were discussed with Patient."

73.     However, despite Dr. De La Rosa Serrano's note reflecting Mr. Chaput's current symptoms and lab values, there is no documentation that the May 10, 2023 CTA liver finding was reviewed, discussed, or acknowledged by Dr. De La Rosa Serrano during this visit.

74.     This omission is significant.  The May 10, 2023 radiology report explicitly flagged the liver finding as a "SIGNIFICANT ABNORMALITY, ATTN NEEDED," and recommended further hepatic imaging.

75. The failure of Dr. De La Rosa Serrano to mention or act upon this finding during the October 30, 2023 visit, nearly five and a half months later, indicates a continued breakdown in follow-up care.

76. On February 28, 2024, Mr. Chaput was noted to have altered mental status, and Plaintiff took her father to the Emergency Department at Grand Strand Regional Medical Center, where he was noted to have labs concerning for urosepsis.

77. A CT of the abdomen and pelvis was performed, which revealed a 3.7 x 3.4 cm liver mass.

78. Mr. Chaput learned for the first time of the existence of the liver mass during this hospitalization.

79. A biopsy of the liver mass showed what was believed to be metastatic adenocarcinoma.

80. On March 11, 2024, Plaintiff called the VA requesting the results of the biopsy that had been performed, indicating that she and Mr. Chaput had been informed that Mr. Chaput's primary care physician at the VA would have to request the biopsy results.

81. The VA subsequently obtained the pathology report for the liver biopsy from the Grand Strand Regional pathology lab.

82. A subsequent PET/CT on March 27, 2024 showed hypermetabolic lesions in the liver and right lung, evidence of metastatic disease.

83. The pulmonary team determined that Mr. Chaput's prognosis was too poor to tolerate systemic cancer therapy.

84. Palliative care was consulted in October 2024.

85.     Mr. Chaput was transitioned to hospice shortly before his death on October 20, 2024.

86.     Prior to Mr. Chaput's death, on July 1, 2024, Dr. Christopher Blasy, a VA physician, entered an Institutional Disclosure of Adverse Event note into Mr. Chaput's VA medical record.

87.     An Institutional Disclosure of Adverse Event is a formal process required under the Department of Veterans Affairs' national policy (VHA Directive 1004.08) when a patient experiences a serious adverse event related to their care that results in or is reasonably expected to result in death or serious harm.

88.     Under this directive, VA medical facilities are obligated to provide patients or their representatives with a transparent, timely, and compassionate disclosure of the event, including an explanation of what occurred, its clinical implications, and steps being taken to address it.

89.     Institutional disclosures are typically conducted by senior clinical staff and are documented in the patient's medical record.

90.     As set forth in the Institutional Disclosure note contained in Mr. Chaput's VA medical chart, on July 1, 2024, Dr. Blasy disclosed to Mr. Chaput and his daughter, Plaintiff Crystal Clark, that the VA had failed to timely address the liver mass when it was discovered in May 2023.

91.     Dr. Blasy acknowledged that the liver mass was noted on the May 10, 2023 CTA, and that this significant abnormal finding was not communicated to Mr. Chaput, acted upon, or followed up on by anyone at the VA.

92. This formal disclosure by the VA constitutes an admission that the delay in evaluating and communicating the May 10, 2023 liver lesion constituted a breach in the standard of care, and that this failure contributed to Mr. Chaput's delayed cancer diagnosis.

93. As with the prior 2019 liver finding, the failure to act on, or even to provide notice of, the abnormal May 2023 liver finding deprived Mr. Chaput of the opportunity for earlier diagnosis, treatment, potentially life-saving or life-prolonging care, and caused prolonged suffering and distress for both Mr. Chaput and his family.

94. These delays allowed Mr. Chaput's cancer to progress to an advanced stage, metastasize, and spread, ultimately resulting in his death.

95. Defendant, through its agents and employees, failed to follow up on critical abnormal imaging findings, despite recommendations for additional evaluation and clear notations of significant abnormalities.

96. As a result of the numerous failures of Mr. Chaput's medical providers at the VA spanning multiple years as set forth herein, Mr. Chaput's cancer remained undiagnosed until it had metastasized, robbing him of the opportunity for earlier intervention and prolonging his suffering.

97. The injuries, suffering, and death of Mr. Chaput were the direct and proximate result of and were caused and occasioned by the negligence, carelessness, recklessness, willfulness, and wantonness on the part of the United States and its agents, employees, and servants in failing to possess and exercise that degree of medical training, competency, and skill ordinarily and customarily possessed and exercised by medical professionals in similar circumstances. Attached as **Exhibit 1** is the Affidavit of Dr. Carol Rupe, who will testify as to one or more deviations from the applicable standard of care.

## FOR A FIRST CAUSE OF ACTION
### (WRONGFUL DEATH)

98. Plaintiff reiterates Paragraphs 1 – 97 above as if set forth verbatim herein.

99. Defendant The United States of America, through its agents, servants, and/or employees, undertook the duty to render medical care to Mr. Chaput in accordance with the prevailing and acceptable professional standards of care in the national community.

100. Notwithstanding said undertaking and while Mr. Chaput was under the care of the agents, servants, and/or employees of Defendant, Defendant departed from prevailing and acceptable professional standards of care and treatment of Mr. Chaput and was negligent, careless, grossly negligent, reckless, and in violation of the duties owed to Mr. Chaput. As such, the United States is liable for one or more of the following acts of omission or commission, any or all of which are departures from the prevailing and acceptable professional standards of care:

   a. In failing to maintain appropriate oversight of and intervention in Mr. Chaput's care over multiple years;

   b. In failing to track all chronic and acute illnesses Mr. Chaput was suffering from, to evaluate and follow up on all studies that were performed, or to orchestrate appropriate care;

   c. In failing to communicate critical imaging findings in a timely manner;

   d. In failing to timely and appropriately follow up on radiology studies that had been ordered;

   e. In failing to order or to otherwise ensure that Mr. Chaput underwent appropriate diagnostic testing and/or radiology studies given his history, presentation, and symptoms;

   f. In failing to make necessary referrals in a timely manner;

    g. In failing to implement adequate policies and/or follow such policies and protocols to ensure timely communication and follow-up of critical test results;

    h. in failing to provide Mr. Chaput timely notice of a serious, life-threatening condition; notice which did not come until 2024 as a result of an Emergency Department visit with a third-party provider, at which point the disease had progressed to such an advanced stage that he was no longer a candidate for systemic cancer therapy; and

    i. in such other ways as may be identified through discovery.

101. As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departures from the professional standards of care by Defendant and its agents, servants, and/or employees, Robert Mark Chaput, Jr. suffered from severe debilitating injuries and an untimely and wrongful death. The Defendant and its agents, servants, and/or employees caused Plaintiff and Decedent's beneficiaries to lose his support, aid, society, comfort, and companionship. Plaintiff Crystal Clark, as the Personal Representative of Mr. Chaput's Estate, is therefore entitled to recover from Defendant a sum of money to compensate the heirs at law for all damages allowable under law for the wrongful death action. All damages should be in an amount determined by a judge at trial.

## FOR A SECOND CAUSE OF ACTION
### (SURVIVAL)

102. Plaintiff reiterates Paragraphs 1 – 101 as if set forth verbatim herein.

103. As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departure from professional standards of care by Defendant and its agents, servants, and/or employees as set forth herein, Mr. Chaput suffered from severe debilitating injuries which caused him conscious pain and suffering while alive, caused his Estate to incur

medical bills, and caused expenses associated with his funeral. Plaintiff Crystal Clark, as Personal Representative of Mr. Chaput's Estate, is entitled to recover from Defendant a sum of money to compensate Mr. Chaput's Estate for all damages allowable under the survival action. All damages should be in an amount determined by a judge at trial.

WHEREFORE, Plaintiff respectfully prays for judgment against the Defendant for actual damages, special damages, and consequential damages in an amount to be determined by the judge at the trial of this action, for the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

MCGOWAN, HOOD, FELDER & PHILLIPS, LLC

By: s/TIMOTHY M. MCKISSOCK
Timothy M. McKissock
Federal Bar No.: 6257
Erin R. Stuckey
Federal Bar No.: 9868
1517 Hampton Street
Columbia, South Carolina 29201
(803) 779-0100
tmckissock@mcgowanhood.com
estuckey@mcgowanhood.com

*Attorneys for Plaintiff Crystal Clark, as Personal Representative of the Estate of Robert Mark Chaput, Jr.*

Columbia, South Carolina
August 8, 2025